# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| SHAWN LILLARD, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 3:13-00806** |
| v. | ) | **Judge Haynes/Brown** |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| ACTING COMMISSIONER | ) | |
| OF SOCIAL SECURITY, | ) | |
| | ) | |
| **Defendant.** | ) | |

**To: The Honorable William J. Haynes, Jr., Chief United States District Judge**

## REPORT AND RECOMMENDATION

This action was brought under 42 U.S.C. §§ 405(g) and 1383(c) for judicial review of the final decision of the Social Security Administration ("the SSA"), through its Commissioner ("the Commissioner"), denying plaintiff's applications for Disability Insurance Benefits (DIB) under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 416(i), 423(d), and Supplemental Security Income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq*. For the reasons explained below, the undersigned **RECOMMENDS** that plaintiff's motion for judgment on the record (Doc. 18) be **DENIED** and the Commissioner's decision **AFFIRMED**.

## I. PROCEDURAL HISTORY

Plaintiff filed an application for DIB and SSI on March 24, 2010 (Doc. 11, p. 147)[1] alleging a disability onset date of September 1, 2009 (Doc. 11, p. 146). Plaintiff claimed that she was unable to work because of bipolar disorder, severe manic-depression, and bilateral carpal tunnel syndrome (CTS). (Doc. 11, p. 137) Plaintiff later amended the alleged disability onset date to October 30,

---

[1] The page numbers referred to in the SSA Administrative Record (Doc. 11) are the numbers that appear in bold in the lower right corner of each page.

2010.  (Doc. 11, p. 135)

Plaintiff's claims were denied initially on July 30, 2010 and again upon reconsideration on September 23, 2010.  (Doc. 11, pp. 57-60)  Thereafter, on October 1, 2010, plaintiff filed a request for a hearing before an Administrative Law Judge (ALJ).  (Doc. 11, pp. 75-77)  A hearing was held on April 16, 2012 before ALJ Shannon H. Smith.  (Doc. 11, pp. 28-56)  Vocational expert Gary K. Sturgill, Ph.D., testified at the hearing.  (Doc. 11, pp. 28, 32, 38-39)

The ALJ entered an unfavorable decision on April 30, 2012.  (Doc. 11, pp. 10-27)  Plaintiff filed a request with the Appeals Council on May 7, 2012 to review the ALJ's decision.  (Doc. 11, pp. 7-9)  The Appeals Council denied plaintiff's request on July 31, 2013, whereupon the ALJ's decision became the final decision of the Commissioner.  (Doc. 11, pp. 1-6)

Counsel brought this action on behalf of plaintiff on August 13, 2013 seeking judicial review of the Commissioner's decision.  (Doc. 1)  Plaintiff filed a motion for judgment on the administrative record on December 9, 2013.  (Doc. 15)  The Commissioner responded on January 7, 2014.  (Doc. 19)  Plaintiff did not reply.  This matter is now properly before the court.

## II.  REVIEW OF THE RECORD

### A.  Medical Evidence[2]

The medical records from Nashville Metro General Hospital ("Nashville General") for the period July 8, 2005 through December 10, 2010 have been included as part of the medical evidence of record.  (Doc. 11, pp. 1046-1133)  Among these records is an August 31, 2007 clinical note attributable to Dr. Thomas Limbird, M.D., who noted upon examination that, although "[plaintiff]

---

[2] Plaintiff's sole claim of error pertains to her alleged disability due to CTS.  The medical evidence summarized below is tailored to that claim of error.

does have pain her hand . . . I can detect no specific findings at all. Her Allen test[3] is negative. Her Tinel's[4] are negative. Her strength is fine." (Doc. 11, 1064) An x-ray study of plaintiff's right wrist that same day by Dr. Glenfield Knight, M.D., at the request of Dr. Limbird, was a "NEGATIVE STUDY," with "no fracture, dislocation or other bony abnormalities" noted, and "[t]he joint spaces . . . unremarkable." (Doc. 11, p. 1065)

Treatment records from the Waverly Belmont Community Medical Center ("the Community Medical Center") (Doc. 11, pp. 877-961) show that Dr. LaTonya Knott, M.D., treated plaintiff numerous times during the period March 26, 2007 to September 1, 2010 including plaintiff's CTS-related complaints on the following dates: July 30, 2007 (Doc. 11, pp. 950-51); August 6, 2007 (Doc. 11, pp. 948-49); September 30, 2008 (Doc. 11, pp. 926-27); October 6, 2008 (Doc. 11, pp. 924-25); October 27, 2008 (Doc. 11, pp. 922-23); November 28, 2008 (Doc. 11, pp. 920-21); January 27, 2009 (Doc. 11, pp. 916-17); February 5, 2009 (Doc. 11, pp. 914-15); February 26, 2009 (Doc. 11, pp. 912-13); July 30, 2009 (Doc. 11, pp. 900-01); February 4, 2010 (Doc. 11, pp. 889-90); September 1, 2010 (Doc. 11, pp. 886, 882-84); and September 29, 2010 (Doc. 11, pp. 880-81). Treatment records from the Southside Family Health Clinic (Southside) (Doc. 11, pp. 964-1042) show that, in addition to the treatment at the Community Medical Center described above, Dr. Knott treated plaintiff for CTS at Southside on July 1, 2010 (Doc. 11, pp. 972-73).[5]

The medical evidence of record includes the records of Dr. W. Garrison Strickland, M.D., Ph.D., for the period October 30, 2008 through November 25, 2008. (Doc. 11, pp. 192-200) Dr.

---

[3] Allen Test – a test performed by manual compression that "indicate[s] obstruction to blood flow" in the artery in question. *Dorland's Illustrated Medical Dictionary* 1885 (32nd ed. 2012).

[4] Tinel (sign) – "a tingling sensation at the distal [farthest point of reference] end of a limb . . . [that] indicates a partial lesion or the beginning regeneration of the nerve." *Dorland's* at 555.

[5] The remainder of the Southside records are duplicates those of the Community Medical Center.

Strickland reported on October 30, 2008 that "[e]lectrodiagnostic studies . . . reveal bilateral median nerve entrapment at the wrists consistent with bilateral carpal tunnel syndrome." (Doc. 11, p. 193) Dr. Strickland also noted the following impression in a companion report dated that same day:

> Electrical evidence of **minimal** *bilateral* medial nerve entrapment at the wrists consistent with *bilateral* CARPAL[] TUNNEL SYNDROME . . . . **Scattered** abnormal nerve conduction and/or diseased [*sic*] CMAP[6] amplitudes with prolonged distal latencies are of **questionable clinical significance**, although in this setting I suspect these may be indicative of . . . underlying PERIPHERAL NEUROPATHY. . . .

(Doc. 11, p. 200)(italics in the original, bold added)

Medical records from the Tennessee Orthopedic Alliance (TOA) are included for the period February 3, 2009 to January 31, 2012. (Doc. 11, pp. 1270-76) Plaintiff was treated by TOA physician Dr. Dave A. Alexander, Jr., M.D., for peripheral neuropathy on February 3, 2009. (Doc. 11, p. 1274) Dr. Alexander noted at the time that plaintiff "acts like she has peripheral neuropathy clinically." (Doc. 11, p. 1274) However, Dr. Alexander also wrote that plaintiff's x-rays "look normal," that TOA " do[es] not typically . . . operate on hands that test at this level," and that plaintiff "d[id] not appear to have classic carpal tunnel syndrome." (Doc. 11, p. 1274)

Dr. Bruce A. Davis, M.D., performed a consultative examination on June 24, 2010 (Doc. 11, pp. 832-35) in which he reported the following: history of bilateral CTS; no syncope; "wrist and finger pain, tenderness (no redness, swelling, warmth) with normal wrist & finger motion/dexterity but reduced pinch and grip – 3-4/5" (Doc. 11, p. 833). Plaintiff was assessed with the ability to perform the following work related activities: lift 20 pounds frequently; carry 10-20 pounds frequently; sit 1-2 hours at one time and 4-6 hours during an 8-hour work day; stand/walk 1 hour at a time, and 4-6 hours in an 8-hour work day. (Doc. 11, p. 834) Dr. Davis also assessed plaintiff

---

6 CMAP – "compound muscle action potential." *Dorland's* at 376.

to have limited ability to reach overhead and to exercise repetitive forceful grip, that she had a limited ability to bend, squat or kneel, and climb, and that her exposure to heights, uneven terrain, extreme heat and cold were limited as well. (Doc. 11, p. 834)

Dr. John H. Mather, M.D., completed a physical residual functional capacity (RFC) assessment of plaintiff on July 23, 2010. (Doc. 11, pp. 855-63) Dr. Mather determined that plaintiff could lift 50 pounds occasionally and 25 pounds frequently, stand and/or walk with normal breaks about 6 hours in an 8-hour workday, sit with normal breaks about 6 hours in an 8-hour workday, and that she had no push-pull limitations, including the operation of hand and/or foot controls. (Doc. 11, p. 856) Dr. Mather also noted, however, that plaintiff had limited ability to reach in all direction, including overhead, that she had limited handling ability, *i.e.*, gross manipulation, but that she had no fingering, *i.e.*, fine manipulation, or feeling limitations. (Doc. 11, p. 858)

Dr. James N. Moore, M.D., affirmed Dr. Davis's June 24, 2010 consultive examination as written on September 23, 2010. (Doc. 11, p. 963)

Plaintiff was seen by Dr. Anthony Disher, M.D., on October 8, 2010 for bilateral wrist pain at the request of Dr. Ronald Baker, M.D. (Doc. 11, p. 1084) Dr. Disher recorded the following impression subsequent to making x-rays of both wrists: "NO EVIDENCE OF ACUTE FRACTURE OR DISLOCATION, OR SIGNIFICANT DEGENERATIVE CHANGE OF EITHER THE RIGHT OR LEFT WRIST." (Doc. 11, p. 1086) Thereafter, Dr. Baker performed CTS release surgery on plaintiff's right wrist on November 3, 2010 and on her left wrist on December 8, 2010.[7] (Doc. 11,

---

[7] The records pertaining to these surgeries are in conflict. The November 3, 2010 "REPORT OF OPERATION" indicates that plaintiff's left wrist was operated on first. (Doc. 11, pp. 1097-98) A related "CLINICAL NOTE" dated November 11, 2010 indicates that surgery was performed on plaintiff's right wrist on November 3, 2010. (Doc. 11, p. 1099) Another record, dated December 8, 2010 indicates that CTS release surgery was performed on plaintiff's right wrist, but that it was performed on October 28, 2010, and that CTS release surgery remained to be performed on plaintiff's left wrist. (Doc. 11, pp. 1106-08) The related "REPORT OF OPERATION" dated December 8, 2010 shows that CTS release surgery was performed on December 8, 2010. Owing to these conflicts, the Magistrate Judge concludes only that Dr. Baker performed CTS release surgery on both wrists during the period October to

Plaintiff presented to the Nashville General Emergency Department (ED) as a walk-in patient on January 26, 2011. (Doc. 11, pp. 1123-30)  Her hand grip was assessed as "strong and symmetric . . . [with] no muscular weakness noted . . . ."  (Doc. 11, p. 1124)  Dr. Baker noted in a followup examination on February 3, 2011 that plaintiff "[wa]s able to return to normal activities using her hands and work[] on gentle range of motion and stretching exercises."   (Doc. 11, p. 1122)  An occupational therapy evaluation performed on March 21, 2011 revealed that, although plaintiff's pain/endurance tolerance was "poor," she had full range of motion of both wrists, with both upper extremities rated as "3/5" ("fair"), and grip strength of 13 pounds in her right hand and 20 pounds in her left hand.  (Doc. 11, p. 1116)

Medical records from the Matthew Walker Comprehensive Health Center are provided for the period February 7 to October 24, 2011.  (Doc. 11, pp. 1240-65)  On February 7, 2011, plaintiff reported "**mild pain** w/motion" with both hands.  (Doc. 11, p. 1245)(emphasis added)  On June 1, 2011, plaintiff reported "moderate" pain in her left "trigger finger" but no CTS pain.  (Doc. 11, p. 1251)  On July 1, 2011, plaintiff reported her CTS pain as "**moderate**."   (Doc. 11, pp. 1254-55)(emphasis added)  On July 29, 2011, plaintiff reported "severe" shoulder pain but no CTS pain. (Doc. 11, p. 1258)  On October 24, 2011, plaintiff reported "severe" shoulder pain but again no CTS pain.  (Doc. 11, p. 1264)

Mr. Sam T. Wolfe, OTR/L,[8] conducted a 'FUNCTIONAL UPPER EXTREMITY ASSESSMENT EVALUATION" of plaintiff on June 23, 2011.  (Doc. 11, pp. 1134-37)  The assessment lasted "approximately one hour," during which time Mr. Wolfe "conducted a series of

---

December 2010.

[8]  OTR/L – Occupational Therapist, Registered, Licensed.

assessments including AROM,[9] grip strength, MMT,[10] fine motor coordination, gross motor coordination and sensation "to determine if [plaintiff] could use her [upper extremities] for vocational purposes." (Doc. 11, p. 1135) Mr. Wolfe concluded based on plaintiff's subjective input that, "[c]onsidering the limitations in range of motion, sensation and severity of pain, [plaintiff] would have difficulty tolerating any form of physical activity involving the use of her hands or arms." (Doc. 11, p. 1135)

The medical evidence of record includes a treating source statement completed by Dr. Knott on March 5, 2012. (Doc. 11, pp. 1277-79) The following summarizes the physical limitations that Dr. Knott attributed to plaintiff: 1) able to sit less than 1 hour at a time and less than 1 hour total during an 8-hour day; 2) able to stand/walk less than 2 hours at a time and less than 2 hours total in an 8-hour day; 3) unable to use both hands repetitively, *i.e.*, incapable of simple grasping, pushing or pulling, or fine manipulation tasks; 4) unable to use feet and/or legs repetitively, including for the use/operation of foot controls; 5) able to lift up to 4 pounds "rarely," *i.e.*, not more than 10 percent of the time during an 8-hour workday; 6) able to lift up to 9 pounds rarely but never more than 9 pounds; 7) able to carry up to 4 pounds rarely but never more than 4 pounds; 8) can bend occasionally, *i.e.*, between 11 and 33 percent of the time during an 8-hour workday, rarely squat, but never crawl, climb, or reach above her shoulder; 9) severe restrictions to unprotected heights, being around moving machinery, and exposure to marked changes in temperature and humidity, with moderate restrictions to driving automotive equipment, and mild restrictions to dust fumes, and gasses. (Doc. 11, pp. 1278-79) Dr. Knott justified the severe restrictions above as follows: "The pt. is s/p carpal tunnel repair and currently wears braces on bilateral wrists. She is unable to manage

---

[9]  AROM – active range of motion.

[10]  MMT – manual muscle testing.

her ADLS at this time." (Doc. 11, p. 1279)

Further records of Dr. Strickland are included in the record. (Doc. 11, pp. 1280-92) In a report dated March 6, 2012, Dr. Strickland notes that plaintiff complained of "BILATERAL hand pain, numbness and tingling," and that her sensory ability was "[d]ecreased in [h]ands." (Doc. 11, pp. 1285-86) Dr. Strickland's impression in a separate report following EMG[11] and nerve conduction studies is quoted below:

> Electrical evidence of **mild** *right* and **minimal** *left* median nerve entrapment at the wrists consistent with *bilateral* CARPAL TUNNEL SYNDROME . . . . **No electrical evidence of generalized peripheral neuropathy** . . . .

(Doc. 11, p. 1282)(italics in the original, bold added)

### B. Transcript of the Hearing[12]

Plaintiff testified that she was 41 years old at the time of the hearing, that she weighted 265 pounds, that she was left handed, that she was single with 4 children aged 14 through 23, that her 14 year old son still lived at home, and that she had a high school diploma. (Doc. 11, pp. 33-34) Plaintiff also testified that she had a cosmetology license and that, although she had a driver's license and tried to drive from "time to time," family and friends drove her around "[m]ost of the time." (Doc. 11, pp. 34-35)

Plaintiff testified that she last worked in 2010, whereupon the ALJ reviewed her employment history. (Doc. 11, pp. 35-38) Upon questioning by the ALJ, the VE testified that plaintiff's prior work experience included light unskilled, light semi-skilled, light skilled, light medium, heavy semi-skilled. (Doc. 11, pp. 38-39)

---

[11] EMG – electromyogram.

[12] The summary of the hearing before the ALJ is tailored again to plaintiff's single claim of error.

8

Plaintiff testified upon further examination by the ALJ that she was unable to return to work because or her "arms and hands." (Doc. 11, p. 40) According to plaintiff, her "arms and hands" made her unable to do "things . . . that [she] used to do" such as caring for her personal hygiene, buttoning and zipping her clothes. (Doc. 11, p. 40) She also testified her arms and hands were "not getting better"– they were "getting worse[]." (Doc. 11, p. 40)

Plaintiff testified that she had CTS release surgery in December 2010, that she had experienced pain in her hands day and night ever since, and that the pain at night would wake her up to the point to where she would be "about [in] tears." (Doc. 11, p. 41) Plaintiff claimed that she was unable to get comfortable in bed at night, and that she "ha[d] to sleep with [her] arms . . . above [her] heart to . . . get some kind of ease . . . ." (Doc. 11, p. 41) Plaintiff rated her pain as "nine every day" on a scale of one to ten where zero is no pain, and that she could do nothing she was "used to doing" because of the pain. (Doc. 11, p. 42)

Plaintiff told the ALJ that she took the following medication for the pain: Gabapentin, Cymbalta, and Diclofenac potassium. (Doc. 11, p. 42) She testified that Cymbalta "sort of put[] [her] a [f]og like, sort of confused," and that the side effects from her other medications included dry cough, inability to sleep, constipation, and a rash. (Doc. 11, p. 42)

Plaintiff admitted that the medications helped "ease" her pain but claimed that physical therapy did not. (Doc. 11, p. 43) Plaintiff testified that, when she finally became so frustrated with physical therapy that she "started crying," she decided to try steroid injections. (Doc. 11, p. 43) According to plaintiff, the steroid injections made the pain worse than before for "two or three days." (Doc. 11, p. 43)

Plaintiff testified that she could sit "45 minutes at the most . . . because of [her] fingers." (Doc. 11, p. 44) She also testified that she could not "stand too long" without having to "sit down

for a minute," and that when she walked "it's like . . . joints popping and stuff . . . [that she would] get charley horses a lot . . . [and her] feet . . . sometimes . . . g[ot] sort of numb . . . ."  (Doc. 11, pp. 44-45)  Plaintiff testified that she had to come "down the stairs sideways . . . one step at a time . . . [a]nd . . . [she] had episodes . . . [when she] urinated all over [her]self" before she could reach the bathroom upstairs.  (Doc. 11, p. 45)

Plaintiff testified that, in the context of her daily living activities, she "tr[ied] to move . . . and maneuver around the house," but that she was "very limited on . . . washing dishes and stuff like that."  (Doc. 11, p. 45)  She testified further that she could not "do much . . . with . . . standing . . . [so she would] try to watch TV," but she was unable to "sit up for a long time."  (Doc. 11, p. 46)  Plaintiff claimed that her 14 year old son had to help her dress and with her personal hygiene.  (Doc. 11, p. 46)  Plaintiff also testified that sometimes she was unable to "grip the washrag, [or] grip the soap to make a lather to wash [her] face."  (Doc. 11, p. 46)  According to plaintiff, her son had to help her wash the dishes, and that she was unable to "run [the] vacuum or [any]thing like that because [she could not] stand that long . . . without dropping the handle o[f] the vacuum cleaner."  (Doc. 11, p. 46)

On examination by counsel, plaintiff testified that Dr. Knott referred her back to Dr. Strickland within "the last week or so" before the hearing, because Dr. Knott "had concerns with [plaintiff's] arms and stuff . . . ."  (Doc. 11, p. 48)  Plaintiff testified that he had "been seeing Dr. Knott since [20]04."  (Doc. 11, p. 49)

Plaintiff testified that Dr. Strickland had her "do another neurologist test," which counsel clarified as a "nerve conduction study."  (Doc. 11, p. 48)  According to plaintiff, Dr. Strickland told her that her "situation with . . . carpal tunnel and the chronic neuropathy [wa]s worse[] than it was . . . before . . . the surgery."  (Doc. 11, p. 49)  Plaintiff testified further that Dr. Strickland told her:

"[Y]our neurologist test show[s] that you got carpal tunnel and the RA and the chronic neuropathy [is] worse that what you had before. I hate to tell you that . . . it doesn't look like he did anything." (Doc. 11, p. 49)

Counsel concluded his examination by establishing that he asked plaintiff to be examined by Mr. Wolfe, that Mr. Wolfe was physical/occupational therapist, not an M.D., and that the examination took place in counsel's office at counsel's request. (Doc. 11, p. 51) Plaintiff, in turn, testified that she "gave it [her] all" in the tests administered by Mr. Wolfe. (Doc. 11, p. 51)

The ALJ returned to the VE at the conclusion of plaintiff's testimony, posing four hypotheticals for him to consider. The first hypothetical was as follows:

> [A]ssume an individual with the same age, education, and past work experience as previously described for the claimant. . . . [able to] lift and carry 50 pounds occasionally and 25 pounds frequently; can stand and/or walk six of eight hours; sit six of eight hours; could perform frequent bilateral overhead reaching and it says overhead work would be unrestricted; frequent bilateral handling. . . .

(Doc. 11, p. 51) The VE testified that this hypothetical person would be able to perform plaintiff's past work "with the exception of the retail stock clerk . . . ." (Doc. 11, p. 52) The ALJ then modified the hypothetical as follows:[13]

> [A]ssume an individual that could lift 20 pounds occasionally and 10 pounds frequently; could stand and/or walk six of eight hours; and sit for six of eight hours; would be able to perform . . . occasional bilateral overhead reaching and occasional bilateral handling . . . .

(Doc. 11, p. 52) The VE testified that "likely . . . only the cashier and the fast food worker would be available." (Doc. 11, pp. 52-53)

The ALJ posed the final hypothetical to the VE quoted below:

---

[13] The ALJ's second hypothetical "added . . . mental limitations consistent" with those plaintiff claimed to prevent her from working. The ALJ's second hypothetical is not addressed in this R&R because plaintiff argues error solely in the context of her physical limitations due to CTS, not to any alleged mental limitations.

> [A]n individual that could lift up to nine pounds rarely with rarely defined as no more than 10 percent of the workday; could sit for one hour during an eight hour workday; and stand and walk for two hours in an eight hour workday; would not be able to perform simple grasping, pushing and pulling, or fine manipulation with either upper extremity; and could not use the feet and legs, either one, for repetitive movement such as foot controls. . . . could occasionally bend, with occasionally described as up to 33 percent of he workday; and never crawl, climb, or reach above shoulder level . . . should avoid driving . . . automotive equipment or machinery . . . and should also avoid concentrated exposure to unprotected heights, moving machinery, or changes of temperature extremes or humidity.

(Doc. 11, p. 53)  The VE testified that "[t]he limits in [the] hypothetical would preclude all work, chiefly because the duration for sitting, standing, and walking . . . equal well less than eight hours and . . . rule out full time work."  (Doc. 11, p. 53)

The questions below were asked by counsel and answered by the VE following the ALJ's hypotheticals:

> Q      Okay.  Talk about, if you can, the need for bilateral manual dexterity in sedentary jobs.
>
> A      Well, for all sedentary work, frequent, at least frequent use of the upper extremities is necessary to perform sedentary work.
>
> Q      Okay.
>
> A      If a person is limited to only occasional use bilaterally of the upper extremities, work is precluded.

(Doc. 11, pp. 54-55)

### C.  The ALJ's Notice of Decision

Under the Act, a claimant is entitled to disability benefits if she can show her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected

to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505, 416.905.  Corresponding regulations outline the five-step sequential process described below to determine whether an individual is "disabled" within the meaning of the Act.

> First, the claimant must demonstrate that she has not engaged in substantial gainful activity during the period of disability.
>
> Second, the claimant must show that she suffers from a severe medically determinable physical or mental impairment.
>
> Third, if the claimant shows that her impairment meets or medically equals one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1, then she is deemed disabled.
>
> Fourth, the ALJ determines whether, based on the claimant's RFC, the claimant can perform her past relevant work, in which case the claimant is not disabled.
>
> Fifth, the ALJ determines whether, based on the claimant's RFC, as well as her age, education, and work experience, the claimant can make an adjustment to other work, in which case the claimant is not disabled.

*See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004)(internal citations omitted); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007).  The claimant bears the burden of proof at steps one through four.  *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).  The burden then shifts to the Commissioner at step five "to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469,  474 (6th Cir. 2003).

The SSA's burden at the fifth step may be met by relying on the medical-vocational guidelines, known in the practice as "the grids," but only if the claimant is not significantly limited by nonexertional impairment, and then only when the claimant's characteristics identically match

the characteristics in the applicable grid rule. *See Wright v. Massanari*, 321 F.3d 611, 615-16 (6th Cir. 2003). In cases where the grids do not direct a conclusion as to the claimant's capacity, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through the testimony of a VE. *See Wright*, 321 F.3d at 616 (quoting SSR 83-12, 1983 WL 31253 at *4 (SSA)). In determining the claimant's RFC for purpose of the analysis at steps four and five, the SSA is required to consider the combined effect of all the claimant's impairments. 42 U.S.C. §§ 423(d)(2)(B), (5)(B); *see Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

A review of the record shows that the ALJ followed the required five-step process. Plaintiff does not allege that she did not.

## III. ANALYSIS

### A. Standard of Review

The district court's review of the Commissioner's final decision is limited to determining whether the findings of fact are supported by substantial evidence in the record, and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003); *Key v. Callahan* 109 F.3d 270, 273 (6th Cir. 1997). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)(quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's decision must stand if substantial evidence supports the conclusion reached, even if the evidence also could support a different conclusion. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). In other words, if the ALJ's findings are supported by substantial evidence based on the record as a whole,

then those findings are conclusive.  42 U.S.C. §§ 405(g), 1383(c); *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *see also Key*, 109 F.3d at 273.

## B.  Claim of Error
### Whether the ALJ Erred in Finding that Plaintiff's RFC Included the Ability to Perform Occasional Bilateral Overhead Reaching and Occasional Bilateral Handling

Plaintiff offers a two-part argument in support of her single claim of error: 1) the ALJ erred in relying on grip strength ratings in the record to support her conclusion that plaintiff's limitations in the use of her hands "could not reasonably be as bad as alleged"; 2) the ALJ erred in not giving controlling weight to Dr. Knott's medical source opinion.[14]

### 1.  Grip Strength Ratings

Plaintiff argues first that the ALJ's reference to plaintiff's grip/pinch strength ratings of 3/5 to 4/5 to support her conclusion that plaintiff's hand limitations "could not reasonably be as bad as [she] allege[s] . . . illustrates that the ALJ ha[d] a misapprehension of what these ratings really mean."  (Doc. 16, p. 8)  Plaintiff contends that the ALJ was of the mistaken impression that 3/5 to 4/5 meant "60 or 80 % of normal grip strength."  (Doc. 16, p. 8)  Plaintiff argues further that her right and left hand grip strengths of 13 pounds and 20 pounds "[m]easured in pounds by the [p]hysical [t]herapist . . . are grossly reduced from Normal grip strengths in adult women."[15]  (Doc.

---

[14]  Plaintiff also refers the following two statements from the ALJ's decision: 1) "'Associated records show that [plainitff] was returned to normal activities with her hands on February 3, 2011'"; 2) "'[Plaintiff] had significantly decreased range of motions in both her hands and wrists . . . [but] . . . she was neurovascularly intact, non-tender to palpation, and was to start physical therapy, and was to start weaning off Lortab.'"  (Doc. 16, p. 7)  Plaintiff asserts with regard to the first statement that the "ALJ offers this as if to say that after medical examination, she was found to be able to use her hands in a normal manner," and with regard to the second statement that "[t]he facts reported here would be of little consequence in evaluating the claimant's Residual Functional Capacity."  Although plaintiff appears to find fault with what she <u>believes</u> the ALJ meant by these two statements, it is not clear whether plaintiff intended these two statements to constitute  two additional arguments in support of her claim of error.  More particularly, plaintiff does not provide law and/or argument that would support the basis for additional arguments in support of her claim of error.

[15]  Plaintiff has provided tables from "Arch Phys Med Rehabil Vol. 66, February 1985" to support her argument that normal grip strength ratings for a "40 year old wom[a]n would be 70.4 lbs. on the right and 62.3 lbs. on the left." (Doc. 16, Ex. 2)

16, p. 8)

The ALJ addressed the grip/pinch strength ratings at issue in three places in her decision. (Doc. 11, pp. 20-21)  Nowhere in her decision does the ALJ equate grip strength ratings of 3/5 to 60% of normal and 4/5 to 80% of normal, nor is there anything in the record that supports such an inference.  Citing the March 21, 2011 physical therapy evaluation discussed previously at p. 6, the ALJ stated only that the grip strength rating of 3/5 equated to 13 pounds on the left and 20 pounds on the right, a statement supported by the physical therapy evaluation.  Plaintiff's argument that the ALJ believed the grip/pinch strength ratings of 3/5 to 4/5 meant "60% or 80% normal grip strength" is an opinion unsubstantiated by the record.

As for plaintiff's argument that her grip strength in her hands are "grossly reduced from Normal grip strengths in adult women," what constitutes an adult woman's "normal" grip strength is irrelevant.  As the term "residual" in RFC implies, RFC means something less than "normal." Here, the ALJ determined that plaintiff had the RFC to perform "light work" as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) with exceptions – not that she was capable of performing "normal" work.

Plaintiff's first argument in support of her claim of error is without merit for the reasons explained above.

## 2.  Dr. Knott's Medical Source Statement

"The Commissioner has elected to impose certain standards on the treatment of medical source evidence." *Gayheart v. Commissioner of Social Sec.*, 710 F.3d 365, 375 (6th Cir. 2013) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)(quoting 20 C.F.R. § 404.1527(d)(2)). These standards, set forth in administrative regulations, describe the various types of evidence that the Commissioner will consider, 20 C.F.R. § 404.1512, who can provide evidence to establish an

impairment, 20 C.F.R. § 404.1513, and how that evidence will be evaluated, 20 C.F.R. § 404.1520b. *Gayheart*, 710 F.3d at 375. Such evidence may contain medical opinions, which "are statements from physicians and psychologists ... that reflect judgments about the nature and severity of [a claimant's] impairment(s), including . . . symptoms, diagnosis and prognosis," physical and mental restrictions, and what the claimant can still do despite his impairments. *Gayheart*, 710 F.3d at 375 (quoting 20 C.F.R. § 404.1527(a)(2)). Medical opinions are to be weighed by the process set forth in 20 C.F.R. § 404.1527(c). *Gayheart*, 710 F.3d at 375.

As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a "nonexamining source"), and an opinion from a medical source who regularly treats the claimant (a "treating source") is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a "nontreating source"). *Gayheart*, 710 F.3d at 375 (citing 20 C.F.R §§ 404.1502 and 404.1527(c)(2)). In other words, "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." *Gayheart*, 710 F.3d at 375 (quoting Soc. Sec. Rul. No. 96–6p, 1996 WL 374180, at *2).

The source of the opinion, therefore, dictates the process by which the Commissioner accords it weight. Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart*, 710 F.3d at 376 (quoting 20 C.F.R. § 404.-1527(c)(2)). If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, as well as the treating source's

area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence. *Gayheart*, 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2)-(6)).

The Commissioner is required to provide "good reasons" for discounting the weight given to a treating-source opinion. *Gayheart*, 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2)). These reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96–2p, 1996 WL 374188, at *5). This procedural requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Gayheart*, 710 F.3d at 376 (quoting *Wilson*, 378 F.3d at 544). Failure to comply with the treating physician rule is subject to subject to harmless error analysis. *Gentry v. Comm's of Soc. Sec.*, 741 F.3d 708, 723 (6th Cir. 2014)(citing *Wilson*, 378 F.3d at 545-46).

The first question is whether Dr. Knott was a treating physician as defined by the regulations. As previously discussed at p. 3, the record shows that Dr. Knott treated plaintiff on numerous occasions from 2007 to 2010, including plaintiff's CTS-related complaints. In short, the record supports the conclusion that Dr. Knott was a treating physician for this particular medical condition. The next question is whether the ALJ gave Dr. Knott's treating source statement controlling weight and, if not, whether the ALJ had "good reasons" for not doing so.

The ALJ addressed Dr. Knott's treating source statement in that part of her decision quoted below:

> The undersigned also considered the physical opinion of Dr. L. Knott, M.D., which asserted a severely restricted range of sedentary exertional category activity . . . . **This opinion merits little weight because it is inconsistent with the claimant's no more than mild**

**electromyogram findings and her retained dexterity and grip strength.** Further, Dr. Knott had not seen the claimant in five months when this opinion was rendered. . . .

(Doc. 11, p. 22)(emphasis added)  The ALJ does not characterize Dr. Knott as a treating physician in the statement above, nor does the ALJ acknowledge that she was required to give Dr. Knott's medical opinion controlling weight unless there was a "good reason" to do otherwise.   Inasmuch as the ALJ clearly did not give Dr. Knott's opinion "controlling weight," the question becomes whether the ALJ had "good reasons" supported by substantial evidence for not doing so.   The Magistrate Judge turns first to those records to which the ALJ refers directly.

The first record relevant to this inquiry, and the one to which the ALJ makes specific reference above, is the medical source statement itself.   A plain reading of the medical source statement reveals that Dr. Knott makes no reference whatsoever to any objective medical evidence in support of the extreme restrictions that she assessed.   As previously discussed at pp. 7-8, Dr. Knott' only explanation for those extreme limitations is summed up in the following statement: "The pt. is s/p carpal tunnel repair and currently wears braces on bilateral wrists.  She is unable to manage her ADLS at this time."   Not only does this statement not constitute/refer to any objective medical evidence, it actually diminishes the credibility of the medical source statement itself.  Anyone – the ALJ included – would be forgiven for failing to see how plaintiff's recovery from CTS surgery, and the fact that she wears braces on both wrists, prevented her from sitting more than 1 hour at a time, or more than 1 hour total during an 8-hour workday, or standing/walking more than 2 hours at a time, or more than 2 hours total during an 8-hour workday.

The next group of records relevant to this inquiry are those medical records pertaining to the times that Dr. Knott treated plaintiff's CTS-related complaints from 2007 to 2010.  A plain reading of these records reveals that Dr. Knott's observations in every instance are based solely on

plaintiff's subjective complaints. In other words, the records are devoid of any objective medical evidence or reference thereto. The Magistrate Judge turns next to the other evidence to which the ALJ made specific reference, *i.e.*, the electromyogram findings, dexterity and grip strength.

As previously discussed at pp. 3-4, 8, the electromyogram findings pertain to tests performed in 2008 and 2012 by Dr. Strickland. The ALJ does not identify to which of these two tests she is referring in the statement above. However, as the ALJ addresses both in her RFC analysis (Doc. 11, pp. 19, 22), the Magistrate Judge will consider both for the sake of completeness.

As previously discussed at pp. 3-4, Dr. Strickland's tests in 2008 established that there was "[e]lectrical evidence of **minimal** bilateral medial nerve entrapment at the wrists consistent with bilateral CARPAL," and "**[s]cattered** abnormal nerve conduction and/or diseased [*sic*] CMAP amplitudes . . . of **questionable clinical significance**." (emphasis added) As previously discussed at p. 8, Dr. Strickland noted 2012 that there was "[e]lectrical evidence of **mild right and minimal left** median nerve entrapment at the wrists consistent with bilateral CARPAL TUNNEL SYNDROME," but "**[n]o electrical evidence of generalized peripheral neuropathy** . . . ." (emphasis added)

The final evidence to which the ALJ made specific reference above is plaintiff's dexterity and grip strength. Although the ALJ again does not identify directly the source of this evidence in the statement above, the ALJ gave "great weight" in her RFC analysis to the June 2010 State agency physical assessment, discussed above at pp. 4-5, in which Dr. Davis assessed plaintiff as having "normal wrist & finger motion/dexterity but reduced pinch and grip 3-4/5." (Doc. 11, p. 833) The ALJ also refers in her RFC assessment to the March 2011 occupational therapy evaluation performed by Nashville General that showed plaintiff had full range of motion in both wrists, an upper extremity strength rating of 3/5 (fair) in both, and grip strength of 13 pounds in her left hand

and 20 pounds in her right hand. (Doc. 11, p. 1116)

The Magistrate Judge takes this opportunity to note the following additional medical evidence that was before the ALJ, although it is not reflected in her RFC analysis. As noted above at pp. 2-3, Dr. Limbird noted in August 2007 that he could not "detect specific findings at all . . . [h]er Allen test is negative . . . [h]er Tinel's are negative . . . [h]er strength is fine." As noted above at p. 3, an x-ray study of plaintiff's right wrist conducted at the same time by Dr. Knight was a "negative study." As noted above at p. 4, Dr. Alexander reported that x-rays of plaintiff's hands "look normal," that plaintiff "d[id] not appear to have classic carpal tunnel syndrome. . . ," and that TOA "d[id] not typically . . . operate on hands that test at this level." As noted above at p. 5, Dr. Disher reported that x-ray studies of plaintiff's wrists for bilateral wrist pain were unremarkable the month before Dr. Baker performed bilateral CTS release surgery. As noted above at p. 6, Nashville General records dated January 26, 2011 show that plaintiff's grip was "strong and symmetric . . . [with] no muscular weakness noted . . . ," and that Dr. Baker determined on February 3, 2011 that plaintiff "w[as] able to return to normal activities using her hands . . . ." Finally, as noted above at p. 6, plaintiff described her CTS pain as mild to moderate throughout 2011, or reported no pain at all.

As shown above, Dr. Knott's opinion was not supported by objective medical evidence. On the contrary, Dr. Knott's opinion was inconsistent with objective medical record of evidence as well as a substantial part of the other medical evidence. In short, the ALJ had "good reason" supported by substantial evidence on the record for concluding that Dr. Knott's opinion "merit[ed] little weight." This claim is without merit.

## IV. RECOMMENDATION

For the reasons explained above, the undersigned **RECOMMENDS** that plaintiff's motion

for judgment on the record (Doc. 18) be **DENIED** and the Commissioner's decision **AFFIRMED**.

The parties have fourteen (14) days of being served with a copy of this R&R to serve and file  written objections to the findings and recommendation proposed herein.  A party shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof.  Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal.  *Thomas v. Arn*, 474 U.S. 140, *reh'g denied*, 474 U.S. 111 (1986); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004).

**ENTERED** this 16th  day of July, 2014.


/s/ Joe B. Brown_____
Joe B. Brown
United States Magistrate Judge